Lloyd *vs.* Cheney.

---

JOHN T. LLOYD, plaintiff in error, *vs.* ISAAC CHENEY, defendant in error.

1. What the real contract between the parties was, is a question for the decision of the jury; and when there is sufficient evidence to sustain the verdict, the Court should not grant a new trial.

2. Where a promissory note was given in consideration of "Confederate notes" borrowed, and a portion of the evidence showed that the note was to be paid in the same currency and evidence was introduced to show the value of Confederate money at the date of the note and at its maturity, and at no other time and the Court charged the jury "that they might ascertain the gold value of Confederate money at the time of the making of the contract and upon, or at the time of the maturity, and adopt either, according to their opinion of the equity of the case;"

*Held*: that the charge, under the evidence, was correct, and that if the Court had charged as to the value of Confederate currency at any other time, he would have erred, as there was no testimony to justify any such charge.

Complaint. Motion for new trial. Decided by Judge WORRILL. Talbot Superior Court, March Term, 1867.

33

This was complaint on a promissory note dated the 7th of March, 1863, and due twelve months after date, whereby Isaac Cheney promised to pay John T. Lloyd, or bearer, $10,700 00 for value received.

Cheney plead the general issue, and that the consideration for the note was Confederate States treasury notes, and by agreement the note was to be paid in such currency; that he tendered the amount, in that currency, in payment; that Lloyd refused to receive it; that he kept the currency till it was worthless, and therefore he owed Lloyd nothing. There was no controversy about the fact that the note was given for Confederate treasury notes loaned by Lloyd to Cheney, and that the loan was negotiated by one Lee.

The note was in evidence. LEE testified that Cheney asked him if he knew where he could borrow some money, and was told by him that his uncle, Lloyd, had some Confederate money which he wished to invest, or get into the hands of good planters until the end of the war, and then to have it paid in good currency; that Cheney said that currency would suit him as well as bank bills, as he wished to pay Dr. Leitner for the Chalybeate Springs; that Leitner had put up gas works there which Cheney could sell for $12,000 00; Lee agreed to meet Cheney at Columbus on a certain day, with $15,000 00, but failing to find Cheney, he loaned another man $5,000 00; that afterwards he met Cheney in Columbus, who still wished the loan, as he needed $15,000 00 to pay Leitner; Lee and Cheney went to Lloyd's room; the terms of the loan were stated as aforesaid; Lloyd gave Cheney his check on the Union Bank at Columbus and took said note, and then Lee assisted Cheney to borrow the other $5,000 00.

LEE also stated that the broker's rate for gold the week before the trial in Columbus was 138 to 140.

On the other hand, CHENEY swore that Lee applied to him to lend out said currency, saying he had $18,000 00 or $20,000 00, belonging to an old uncle of his, to loan; that he said he knew no one who wished to borrow, but that he owed Dr. Leitner a note due early in the next year, and that per-

haps he could pay it off or shave it.  Cheney went to Columbus, saw Leitner, and agreed to take up Leitner's note on him and Paul by paying $14,000 00; he told Lee that Leitner would take the money; Lee had $2,500 00; went to Lloyd and got $5,000 00; borrowed $2,500 00 elsewhere, and for these three sums, so obtained, Cheney gave said note. Witness then borrowed $4,000 00 from others, procured a certificate of deposit to Leitner's order for $14,000 00 and subsequently paid the same to Leitner.  Cheney further testified that a few days before his note was due, he offered to pay it off in Confederate treasury notes, but Lloyd would not take it, and said he would not take it when the note was due; that he kept (though not the same bills) a sufficient amount to pay the note, thinking Lloyd might conclude to take it, and it became worthless in his, Cheney's, hands, and that he never made such contract as Lee testified to, but really borrowed the money to accommodate Lee.  Cheney said he had bought of Leitner said Springs, furniture, stock, etc., and this note was for the second payment on that purchase, at a Confederate valuation.  Leitner used the Springs about three years, and, *ad interim*, built the doctor's shop, the two-story building in front of the hotel, and spring house, and had repaired the baths and had bought and added to the premises a plantation of five hundred and forty-four acres of land, worth from $1 50 to $3 00 per acre.

LEITNER testified that he held a note of $15,000 00 on Cheney and Paul, due in January, 1864, and agreed to take off the interest if Cheney would pay it in Confederate treasury notes, and Cheney brought him a certificate of deposit for $14,000 00 to Leitner's order, and with it took up the note. Cheney had Leitner's bond for titles, which was taken up and a deed made.  Leitner, in 1859, bought the Springs from Cheney, including the furniture, at about $20,000 00, and afterwards he sold to Cheney and Paul at $38,000 00 or $40,-000 00, Confederate valuation; about $15,000 00 of this was paid in Leitner's notes given in the old purchase, and said discounted note was a part of said purchase money in the re-sale, and was understood to be payable in Confederate

money. Leitner has added about $5,000 00 in improvements to the Springs, and when Cheney paid off this last note one dollar in bank bills would buy two or three dollars in Confederate currency, and twelve months thereafter one dollar in bank bills was worth three or four dollars in said currency.

The value of corn, osnaburgs, cotton-cards, salt and iron, March, 1863, and March, 1864, were proved. It was shown that corn was uniformly relatively lower than gold, in currency, and the other articles were higher than gold. At the date and maturity of the note, respectively, bank bills commanded two and four times their face in Confederate money. By the table of Barber & Son, which was in evidence and admitted to be correct, it appeared that on the 7th of March, 1863, one dollar in gold bought four, and on the 7th of March, 1864, it bought twenty of Confederate dollars. The record did not copy from said table the valuation at any other dates. It was also shown that at the date of said tender, "the thirding law" of the Confederate States was about to go into operation.

The plaintiff objected to the proof of the value of corn, etc., and the testimony of Lee as to the terms on which the loan was made; but both objections were overruled.

The Court charged the jury that they might take corn, etc., as a standard of valuation of Confederate treasury notes, if they considered that more equitable than taking gold for such standard; and, in that case, they would ascertain how much corn, etc., that amount of Confederate money would buy, and then ascertain what that corn, etc., would sell for in present currency, and find that amount, *plus* interest; or if they took gold for their standard, they might take the value at the date or at the maturity, and find according to the principles of equity.

The defendant's attorney requested the Court to charge the jury that if it was the contract that the note should be paid in Confederate currency, and it was tendered and refused, and was lost by Cheney's keeping it on hand, the loss might equi-

tably be put on the plaintiff by the jury.   The Court refused to so charge.

The verdict was for $722 00 for plaintiff, without interest or cost.   The plaintiff moved for a new trial upon the grounds that the ordinance of 1865, under which the objectionable testimony aforesaid was introduced, was unconstitutional; that the Court erred in confining the investigation of the jury as to the value of the currency in gold to the date and maturity of the note; because the verdict was contrary to the evidence, and because one of the jury was a brother-in-law of defendant, which was unknown to plaintiff's attorney till after the verdict.   It was shown that the jury-man married defendant's sister, who died many years before, and the jury-man swore that he was not otherwise akin to the defendant, and had no greater regard for him than for other respectable gentlemen.

The Court refused the new trial, and this the plaintiff assigns as error.   The defendant assigned as erroneous the charge of the Court as to making corn, etc., a standard of valuation.

J. N. RAMSEY, for plaintiff in error.

B. HILL, for defendant in error.

WALKER, J.

We have in several cases held that the ordinance of November, 1865, "to adjust the equities between parties," does not impair the obligation of contracts.   It furnishes a rule of evidence by which to ascertain the real meaning of parties to contracts in certain cases, and give those contracts an equitable construction, so that verdicts and judgments thereon may be rendered on principles of equity.   The ordinance does not authorize the Court to make contracts for parties, but enables the Court to do justice in the enforcement of contracts made under a state of circumstances differing from those surrounding the parties when those contracts are to be executed.

Lloyd *vs.* Cheney.

1. It is with reluctance that we interfere with the finding of a jury; more especially when the consideration is Confederate treasury notes. So many things may be taken into consideration in adjusting the equities between the parties, that it is often very difficult to determine precisely what amount should be paid; and hence, in this class of cases especially, are we loth to control the finding of the jury. Where property of a substantial character, of pretty uniform value, is the consideration of a contract, it is much easier to arrive at a satisfactory conclusion, than when Confederate notes is the is the subject of consideration. In this case, the consideration of the note sued on was Confederate notes; and a portion of the testimony was that it was to be paid in the same currency. This was an issue to be passed upon by the jury. There is evidence sufficient to sustain their finding on this issue. If the contract was that the note was to be discharged in Confederate currency, as found by the jury, the plaintiff ought to have accepted the payment when tendered to him. The facts in this case amounted to a tender in currency. If the currency tendered was what was contracted for, and of that the jury were to determine, then the plaintiff has no cause of complaint that he was not allowed to recover interest and costs. The offer of defendant to comply with the terms of his contract ought to have protected him against interest and costs.

2. In his charge to the jury, the Court told them they might, in adjusting the equities, consider the purchasing power of Confederate notes as compared with corn or any other of the various articles and commodities in testimony before them. This certainly was giving as wide a range for investigation as the parties could desire. But it is said the Court confined the jury to the value of Confederate notes in gold, at the date of the note and at its maturity. The record shows the value of Confederate notes as compared with coin, at these two dates, and at no other time, and the Court told the jury that they might adopt the one or the other, as they thought would be equitable. What else could he have told them as to the value of gold? There was no proof of its

value at any other time, and for him to have told them they might consider its value at any other time, would have been charging on an assumed state of facts, and would have been erroneous.   We think the Court instructed the jury as fully as he was authorized to do under the evidence, and if the parties had wished the jury to consider the value of gold at other times, as compared with Confederate notes, they should have introduced evidence of such value at other times, and then the Court could have instructed them upon the law applicable thereto.   The Court very properly declined to charge upon an assumed state of facts.

The defendant, in the argument before us, expressed himself satisfied with the verdict, unless the Court should award a new trial on some of the grounds taken by the plaintiff; in that event, he wished his exceptions considered, but not otherwise.   As we affirm the judgment of the Court below, a decision of the points made by defendant is rendered unnecessary.

Judgment affirmed.

NOTE.   WARNER, C. J., concurred, and HARRIS, J., dissented; but neither wrote out any opinion.